IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DESMON LOEB,

      Plaintiff,                    Case No. 2:05-cv-00903 ALA (P)

  vs.

D.L. RUNNELS, et al.,

      Defendants.             <u>ORDER</u>

_____/

      Plaintiff, Mr. Loeb, is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. Pursuant to the Court's screening order of November 20, 2006 (Doc. 13), this action proceeds solely on Mr. Loeb's Eighth Amendment claims against defendants, as articulated in the second amended complaint. (Doc. 11).  Within the second amended complaint, Mr. Loeb alleges that Defendants violated his Eighth Amendment Rights by: (1) depriving him of outdoor exercise for five months (from January through June 2005); (2) depriving him of clothing, sanitary items, and utensils for twenty-one days following a cell extraction on April 22, 2005; and (3), and placing him on continued management status beyond twenty-four hours, following a cell extraction on April 22, 2005.

      On May 5, 2008, Defendants Hickman, Wong, Runnels, Felker, and Rath filed a motion for summary judgment. For the foregoing reasons, the motion for summary judgment is granted.

1

I

A

On July 29, 1993, Desmon Undrea Loeb was sentenced to a term of fifteen-years-to-life in state prison following convictions for assault with a firearm, evading a police officer causing bodily injury/death, and voluntary manslaughter. (Defendants' Statement of Undisputed Facts On April 23, 1996, Loeb, a black inmate, was transferred from Calipatria State Prison to High Desert State Prison (HDSP).

HDSP, one of forty-one state prisons, is a Level-IV prison—a high security prison—because the inmates confined at that institution are deemed to pose the greatest threats to institutional security, safety of staff, and safety of the public. The prison consists of four primary facilities—Facilities A, B, C, and D (high security units). In addition to these primary facilities, HDSP also includes Facility E (a minimum support facility) and Z Unit (a stand-alone Administrative Segregation Unit). Mr. Loeb was housed in Facility D.

B

On the morning of December 28, 2004, a group of "Hispanics"[1] attacked a group of black inmates in Facility D. To facilitate searches of the black and Northern Hispanic inmates, as well as to conduct interviews with these inmates, the entire general population for Facility D was placed on lockdown.

On January 1, 2005, a few days after the December 28, 2004 lockdown was imposed, two pieces of metal were discovered missing from an inmate's knee immobilizer. Because these pieces of metal were estimated to contain enough material to manufacture approximately twelve inmate-manufactured weapons, it was necessary to search all cells for weapons. As a result, the lockdown initiated on December 28, 2004 was followed by a second lockdown order, affecting the entire general population of Facility D. In addition, because the cell searches and inmate

---

[1] Defendants use the terms "Hispanics," "Northern Hispanics," "Southern Hispanics," and "Mexican Nationals" to describe different groups within the prison.

2

interviews regarding the December 28, 2004 riot had not been completed, the discovery of this missing metal extended the initial lockdown.

On January 12, 2005, all cell searches were completed, with negative results for additional weapons. Accordingly, all black inmates on Facility D, who had been targeted in the December 28, 2004 attack, were returned to their normal program. However, the investigation regarding the December 28, 2004 riot had not been completed, and thus the Northern Hispanics on Facility D remained on lockdown.

Two days later, on January 14, 2005, a group of Southern Hispanics attacked correctional staff on Facility D. As a result, the entire Southern Hispanic population on Facility D was placed on lockdown.

From January 13 through 27, 2005, black inmates housed in Facility D were not subject to any lockdowns, and were not precluded from routine yard access because they had been returned to normal programming. However, because of the ongoing investigations into the circumstances surrounding the lockdowns of the other ethnic groups in Facility D (and the resulting shortage of correctional staff to supervise the yard), and because of bad weather, black inmates were only allowed yard access a few times.

On January 27, 2005, correctional staff received information that assaults on staff members were being planned by the inmates housed in various facilities at HDSP. Considering this information, in combination with previous staff assaults by inmates of various ethnic groups that had occurred, as well as the race-based riots, and discovery of contraband in the institution, the entire general population of HDSP was placed on lockdown. Inmates were not permitted to return to their regular program activities, including daily yard exercise, until an investigation into the threats against staff were completed.

From January 27 through March 23, 2005, the investigation into the December 28, 2004 riot continued, as did an investigation into the January 27, 2005 report of inmate threats against staff. Because there were two investigations being conducted at once, the lockdown was

extended.

On March 22, 2005, Facility D correctional staff received information from two confidential sources that the black inmates on Facility D were conspiring to assault staff. As a result, the black population on Facility D was placed on lockdown, pending an investigation into these allegations. As an additional result, the initial lockdown was further extended because three investigations were now being conducted at once: (1) the investigation into the December 28, 2004 riot; (2) the investigation into the January 27, 2005 report of general inmate threats against all HDSP staff; and (3) the investigation into the March 22, 2005 report of Facility D black inmates' threats against staff.

From March 21 through April 7, 2005, all of Facility D was searched for inmate manufactured weapons and contraband. Following completion of the search, on April 8, 2005, the Mexican National and "other" inmate populations were returned to normal programming. However, investigations continued regarding: (1) the December 28, 2004 between Northern Hispanics and blacks; (2) the January 14, 2005 incident where Southern Hispanics attacked correctional staff; and (3) the March 22, 2005 report of black inmates conspiring to assault staff. As a result, the Southern Hispanic, Northern Hispanic, and black inmate population remained on lockdown. Investigations into the three incidents continued through June 3, 2005.

By June 17, 2005, the investigation into the threats against staff by Facility D black inmates was nearing completion, and an unlock plan was being developed. However, the next day, on June 18, 2005, correctional staff received an anonymous letter indicating that the black population on Facility D was conspiring to assault staff. As a result, the Facility D black inmate population was placed on lockdown, pending completion of an investigation into this threat.

By June 21, 2005, the investigation into the June 18, 2005 threat by Facility D black inmates to assault correctional staff was completed, and an incremental unlock proposal for the Facility D black inmates was submitted. This proposal allowed Facility D black

inmates limited outdoor exercise.  This proposal was implemented and by June 28, 2005, black inmates on Facility D were receiving outdoor exercise.

### C

On April 22, 2005, during the January through June 2005 lockdown,, Mr. Loeb refused to return his breakfast food tray to correctional staff after being served breakfast in his cell.  As a result, correctional staff had to extract Loeb from his cell with the use of pepper spray.

### II

### A

Pursuant to Rule 56(c)of the Federal Rules of Civil Procedure, summary judgment may be granted in favor of a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A party's motion for summary judgment must be granted "after adequate time for discovery and upon motion . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  "The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact."  *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).  "Once the moving party meets its initial burden, however, the burden shifts to the non-moving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial."  *Id*. (internal quotation marks omitted).

Where the party resisting a motion for summary judgment is *pro se*, the court "must consider as evidence in his opposition to summary judgment all of [his] contentions offered in

motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [he] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (holding that allegations contained in a *pro se* plaintiff's verified pleadings must be considered as evidence for purposes of summary judgment).

Here, Mr. Loeb's second amended complaint is verified (Doc. No. 11) and, thus, will be considered as evidence for purposes of summary judgment. Mr. Loeb filed a declaration in opposition to defendant's motion for summary judgment (Doc. No. 51). This document is also verified and will be considered as evidence for purposes of summary judgment.

B

To state a § 1983 claim, a plaintiff must show (1) that he or she has been deprived of a right secured by the United States Constitution or a federal law and (2) that the deprivation was effected "under color of state law." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). To prevail on any claim of cruel and unusual punishment, a prisoner must prove facts that satisfy a two-part test. First, the conditions alleged must be sufficiently serious such that the official's act or omission results in the denial of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). Second, the officials responsible for these conditions must exhibit "deliberate indifference" to the inmate's health and safety. *Id.* They must act with a state of mind "more blameworthy than mere negligence." *Id.* at 835.

C

The deprivation of outdoor exercise by prison officials to prisoners can constitute cruel and unusual punishment in violation of the Eighth Amendment. *Spain v. Procunier*, 600 F.2d 189 (9th Cir.1979). "[S]ome form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Id*. at 199. Deprivation of necessities by a prison official violates the Eighth Amendment when two requirements are met: (1) the

deprivation alleged must be, "objectively, sufficiently serious," and (2) the prison official possesses a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citations omitted) (quotation omitted). In determining whether a deprivation of a basic necessity, such as outdoor exercise, is sufficiently serious to satisfy the objective component, a court must consider the circumstances, nature and duration of the deprivation. *Spain*, 600 F.2d at 199. To satisfy the subjective component, the requisite state of mind depends on the nature of the claim. In prison-conditions cases, the necessary state of mind is one of "deliberate indifference." *Farmer*, 511 U.S. at 834.

Mr. Loeb asserts that Defendants violated his Eighth Amendment rights by depriving him of outdoor exercise for five months, from January through June of 2005. In their motion for summary judgment, Defendants assert that the undisputed evidence shows that Defendants imposed a lockdown of Facility D as a result of an attack by a group of Northern Hispanic inmates upon black inmates on December 28, 2004. Defendants' Motion for Summary Judgment 14. Defendants contend that a total lockdown was necessary to prevent the further eruption of violence, and to facilitate cell searches and inmate interviews. Id.

A temporary denial of outdoor exercise during an emergency lockdown period does not rise to the level of an Eighth Amendment violation. *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir.1980). In *Hayward*, the Ninth Circuit found that the deprivation of outdoor exercise and a five-month lockdown in response to a genuine emergency did not violate the Eighth Amendment. *Id.* There, the rate of violent incidents more than tripled during the lockdown, and the influence of prison gangs steadily grew. *Id.* at 600. In *Hayward*, the Ninth Circuit recognized that when a lockdown is instituted in response to a genuine emergency, the decisions regarding when and how to provide for outdoor exercise "are delicate ones, and those charged with them must be given reasonable leeway." *Id*.

Here, Defendants Runnels, Felker, Rath, and Wong imposed a lockdown on Facility D as

7

a result of an attack by a group of Northern Hispanic inmates upon black inmates on December 28, 2004.  Defendants' Motion for Summary Judgment 14.  According to Defendants, a "total lockdown was necessary to prevent the eruption of further violence, and to facilitate cell searches and inmate interviews." *Id.*   The period was extended five months because of the repeated violent incidents, as well of threats of violence.  Once the causes for violence, as well as the threats of violence, were resolved with respect to the black inmates at HDSP, they were allowed to access the exercise yard.

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citation omitted).   Defendants Runnels, Felker, Rath, and Wong had a responsibility to prevent new outbreaks of violence and injury to staff and inmates. Mr. Loeb does not set forth any evidence refuting the prison conditions at HDSP from January 2005 through June 2005.  To avoid summary judgment, Mr. Loeb must present  some "'significant probative evidence tending to support'" the allegations.  *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir.1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).  Because it remains unrefuted that the violent prison conditions warranted a five month lockdown, Defendants are entitled to judgment as a matter of law as to the Eighth Amendment claim for deprivation of outdoor exercise.

D

Mr. Loeb alleges that Defendants subjected him to cruel and unusual punishment, in violation of his Eighth Amendment rights, when they deprived him of clothing, utensils, and sanitary items following a cell extraction on April 22, 2005.  Defendants argue that there is no causal connection between Defendants' actions and Mr. Loeb's twenty-one day denial of clothing, utensils, and sanitary items.   Defendants' Motion for Summary Judgment 20, 23. Defendants further assert that Mr. Loeb's allegations against the Defendants are limited to their supervisory roles they played as high-ranking officials.

"To sustain an action under section 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right." *Hydrick v. Hunter*, 466 F.3d 676, 689 (9th Cr. 2006) (quoting *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir.1989)). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of 1983, if [that person] does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made." *Id.* (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)). There is no respondeat superior liability under § 1983, and a person can only be subject to § 1983 liability for the acts of others "[i]n limited circumstances." *Id.* "[A] supervisor is liable for the constitutional violations of subordinates, 'if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.' " *Id.* (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989)).   Mr. Loeb does not present any evidence that Defendants engaged in any affirmative act, or failed to perform a legally required duty, which resulted in Mr. Loeb's twenty-one day deprivation of clothing, utensils, and sanitary items following an April 22, 2005 cell extraction.   Thus, Defendants are entitled to judgment as a matter of law as to this claim.

E

Mr. Loeb asserts that Defendants subjected him to cruel and unusual punishment, in violation of the Eighth Amendment, when they placed him on continued management status beyond twenty-four hours, following an April 22, 2005 cell extraction.   Defendants contend that the undisputed facts show that Mr. Loeb was not placed on management cell status following the April 22, 2005 cell extraction.

For Mr. Loeb to pursue his claim that his placement on management cell status violated his rights under the Eighth Amendment, there must be some evidence that he was placed on

management cell status following the April 22, 2005 cell extraction. *See Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir.1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)) (to avoid summary judgment, a party must present some "'significant probative evidence tending to support'" the allegations). Defendants contend that:

> when an inmate is placed on management cell status, this placement is documented on a CDCR 128-B chrono, documenting the reason for placement on management cell status, and this chrono is placed in the inmate's central file. . . . Whenever an inmate is placed on management cell status, and their central file contains no CDCR 128-B or 114-A referencing this placement, other documentation in their central file, such as Unit Classification Committee or Institutional Classification Committee chronos, or Rules Violation Reports, may mention this placement.

Defendants' Motion for Summary Judgment 11.

The undisputed facts show that Mr. Loeb's file contains no CDCR 128-B or 114-A referencing his placement on management cell status. No other reference was made to his placement on management cell status in his central file. Mr. Loeb does not explain the absence of these records. To avoid summary judgment, Mr. Loeb must present some "'significant probative evidence tending to support'" the allegations. *Gen. Bus. Sys.*, 699 F.2d at 971 (quoting *First Nat'l Bank of Ariz.*, 391 U.S. at 290). Because Mr. Loeb cannot present any evidence that he was placed on management cell status, Defendants are entitled to summary judgement as to this claim.

Accordingly, IT IS HEREBY ORDERED that:

    1. Defendants Hickman, Wong, Runnels, Felker, and Rath's motion for summary judgment is GRANTED.

DATED: June 20, 2008

                                      /s/ Arthur L. Alarcón
                                      UNITED STATES CIRCUIT JUDGE
                                      Sitting by Designation